UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SHANNA MCNAIR,

Case No.: 3:17-cv-00280-AC

Plaintiff,

OPINION AND ORDER

v.

COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

---

D. JAMES TREE
Tree Law Offices
3711 Englewood Avenue
Yakima, WA 98902
      Attorney for Plaintiff

BILLY J. WILLIAMS
United States Attorney
RENATA GOWIE
Assistant United States Attorney
District of Oregon
1000 S.W. Third Ave., Suite 600

PAGE 1 - OPINION AND ORDER

Portland, OR 97204-1011

BENJAMIN GROEBNER
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S/ 221A
Seattle, WA 98104-7075
        Attorneys for Defendant

ACOSTA, Magistrate Judge:

*Introduction*

Shanna McNair ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for Title XVI Supplemental Security Income ("SSI") under the Social Security Act ("Act"). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons that follow, the Commissioner's decision is REVERSED and REMANDED for additional proceedings.

*Procedural Background*

Plaintiff protectively filed for SSI on July 19, 2011, alleging disability beginning August 28, 2010. (Tr. 94.) After the Commissioner denied her application initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 104, 116-17, 149.) A hearing was held via video teleconference on January 24, 2013. Plaintiff, represented by counsel, testified. (Tr. 149.) Paul Prachyl, a vocational expert ("VE") and Stephanie Boyce ("Ms. Boyce"), Plaintiff's daughter, also testified. (Tr. 35-93.) On March 19, 2013, the ALJ issued an unfavorable decision, finding Plaintiff not disabled. (Tr. 17-30.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final. (Tr. 1.) Plaintiff filed a complaint for review of the

Commissioner's final decision in the United States District Court for the Eastern District of Washington, resulting in a remand for additional proceedings pursuant to sentence four of 42 U.S.C. § 405(g). (Tr. 584-99.) On May 3, 2016, a second hearing before the ALJ was convened, but not completed, due to the late receipt of additional medical records. (Tr. 538-48.) On August 16, 2016, the ALJ held a full hearing via video teleconference. (Tr. 482.) Plaintiff, Ms. Boyce, and VE, Ann Jones, testified. (Tr. 506-35.) On November 22, 2016, the ALJ issued another unfavorable opinion finding Plaintiff not disabled, making it the final decision of the Commissioner. (Tr. 479-96); 20 C.F.R. §§ 416.1483-416.1484. Plaintiff filed this complaint for review of the Commissioner's final decision on February 17, 2017.

## Factual Background

Born on February 15, 1964, Plaintiff was 47 years old when she filed her SSI application and 52 years old at the second administrative hearing. (Tr. 94, 488.) Plaintiff completed her GED and has past work as an in-home health care provider and convenience store cashier. (Tr. 214-15, 218.) She alleges disability due to low back pain, depression, anxiety, irritable bowel disease, memory loss, extreme fatigue, joint pain, muscle weakness, and loss of concentration. (Tr. 95.)

## Standard of Review

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotations omitted). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez*

*v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citation omitted).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 416.920(b). If so, the claimant is not disabled.

At step two, the Commissioner evaluates whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. § 416.920(c). If the claimant does not have a medically determinable, severe impairment, he is not disabled.

At step three, the Commissioner determines whether the claimant's impairments, either singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. § 416.920(d). If so, the claimant is presumptively disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner resolves whether the claimant can still perform "past relevant work." 20 C.F.R. § 416.920(f). If the claimant can work, she is not disabled; if she cannot perform

past relevant work, the burden shifts to the Commissioner. At step five, the Commissioner must establish that the claimant can perform other work existing in significant numbers in the national or local economy. *Yuckert*, 482 U.S. at 141 – 42; 20 C.F.R. § 416.920(g). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 416.966.

### The ALJ's Findings

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 485.)

At step two, the ALJ found that Plaintiff had the following severe impairments: disorder of the gastrointestinal systems; disorders of muscle, ligament, and fascia; osteoarthritis and allied disorders; degenerative disc disease; other unspecified arthropathies; chronic obstructive pulmonary disorder (COPD); affective disorders; and obesity. (Tr. 485.)

The ALJ found anxiety to be non-severe, noting "evidence fails to establish the claimant's anxiety would have more than minimal limitations on her ability to perform basic work activities." (*Id.*) Further, the ALJ determined that fibromyalgia was not a medically-determinable impairment. (*Id.*) Noting that Plaintiff's primary symptom allegations with regards to fibromyalgia are fatigue and body pain, the ALJ found that even if the condition was medically determinable, it would not cause any additional limitations beyond those already accounted for in the residual functional capacity ("RFC") determination. (*Id.*)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 486-87.)

Next, the ALJ assessed Plaintiff's RFC and found that she could perform unskilled, light work as defined in 20 C.F.R § 416.967(b), except that she "is not able to perform at a production rate

pace (e.g., assembly line work, i.e., where pace is mechanically controlled) but can perform goal-oriented work (e.g., office cleaner or those tasks where pace is more controlled by the worker)." (Tr. 487.) Plaintiff is expected to be "off-task" about ten percent of the time in an eight-hour work day and her "work tasks should not carry her more than five minutes from a restroom, such as having to travel from one job site to another." (Tr. 487-88.)

At step four, the ALJ found that Plaintiff is unable to perform past relevant work as a home attendant. At step five, based on the testimony of the VE, the ALJ determined that Plaintiff could perform work as a cashier II, fast food worker, and cleaner/housekeeper, all of which exist in significant numbers in the national economy. (Tr. 495.) The ALJ therefore concluded that Plaintiff was not disabled. (*Id.*)

*Discussion*

Plaintiff alleges the ALJ erred by: (1) improperly discrediting Plaintiff's subjective symptom allegations; (2) improperly assessing medical opinion evidence; (3) improperly discrediting lay witness testimony; (4) failing to recognize fibromyalgia as a medically determinable impairment at step two; and (5) failing to appoint a medical expert.

I.     Plaintiff's Subjective Symptom Testimony

If "there is no affirmative evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281, 1283–84 (9th Cir. 1996)). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The

reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies either in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, a sparse work history, testimony that is vague or less than candid, and testimony about the nature, severity and effect of the symptoms complained of from physicians and third parties. *Tommasetti*, 533 F.3d at 1040; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### A.      Pain Symptoms

Plaintiff argues the ALJ erred by discrediting her subjective pain allegations based solely on a lack of objective medical evidence. An ALJ may not discredit a claimant's subjective symptom allegations based solely on a lack of medical evidence; however, it may be considered among other factors. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

In her disability application, Plaintiff stated that she needed to lie down frequently and use a heating pad for pain. (Tr. 227.) She indicated that her pain prevented her from doing things that required bending, such as getting laundry out of the dryer, putting the dog food bowl on the floor, and shaving her legs; she also stated that she needed a raised toilet seat. (Tr. 227-28.) Likewise, at the January 2013 hearing, Plaintiff testified that she was unable to physically life her four-year-old granddaughter due to back pain. (Tr. 61.) She further testified that her pain symptoms began in her low back but that she now had pain in her joints, primarily on her left side. (Tr. 57.) Plaintiff also

testified that she had to lie down a dozen times a day and used a heating pad so frequently that she had "fried" the skin on her back. (Tr. 58-59.) Although she was able to stand and do the dishes for up to fifteen minutes, Plaintiff endorsed the need to lie down for twenty minutes to an hour due to pain afterwards. (*Id.*) Plaintiff testified that she had tried, unsuccessfully, alternating ice with heat, physical therapy, exercises given to her by emergency room ("ER") staff, and Icy Hot to alleviate her back pain. (Tr. 59.)

At the August 2016 hearing, Plaintiff testified that, "my skin, my bones, everything hurts" and that her pain was a ten-out-of-ten without medication, and somewhere between and five- and seven-out-of-ten with pain medication. (Tr. 517.) Plaintiff testified that she exercised by walking up and down the stairs at her daughter's house two to three times, but when she is not at her daughter's house she did not exercise. (Tr. 523-24.)

The ALJ found that the objective medical record did not support the intensity, persistence, and limiting effects of Plaintiff's pain allegations, noting that imaging had revealed only mild abnormalities or degenerative changes. (Tr. 488-89.) In February 2015, a pelvic x-ray revealed an osteoarticular abnormality, mild evidence of osteoarthritis in both hips, and a displaced symphysis pubis. (Tr. 800.) Bilateral knee x-rays revealed evidence of osteoarticular abnormalities, narrowing medial joint spaces, and moderate osteoarthritis in the left knee with mild to moderate osteoarthritis in the right knee. (*Id.*) In March 2015, an MRI of the lumbar spine revealed some discogenic changes and mild facet arthritis without significant central canal stenosis or neural foraminal narrowings. (Tr. 863.) MRI and CPT scan imaging in 2011 also revealed mild findings in the lumbar spine, shoulders, and knees, and an EMG nerve conduction study showed normal findings. (Tr. 417-23.)

In addition to the lack of objective evidence, the ALJ found that generally benign treatment notes throughout the record were inconsistent with Plaintiff's pain allegations. (Tr. 489, 491); *see Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). Treatment records reflect that even when Plaintiff presented with complaints of back or joint pain, she generally had a normal range of motion (tr. 368, 381, 429, 435, 470-71, 476, 804), ambulated normally (tr. 468, 779, 785, 792, 796-97), and although she exhibited tenderness to palpation (tr. 429, 435, 460, 470-71, 785, 789), she did not appear to be in distress. (Tr. 779, 785, 792, 796-97, 800, 804.) Furthermore, despite Plaintiff's claims of spending considerable time lying down, there were no signs of diminished strength or wasting; rather, she exhibited normal muscle tone and motor strength. (Tr. 471, 779, 785, 792, 796-97, 800, 804.)

Pointing to instances where Plaintiff had an irregular gait (tr. 435, 789, 800, 1048) or limited range of motion, (tr. 415-16, 460, 466-67, 789, 800), Plaintiff argues that the treatment record supports her pain testimony. Similarly, Plaintiff argues, imaging results showing degenerative changes support her pain allegations. While this evidence "may also admit of an interpretation more favorable" to Plaintiff, the court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Burch*, 400 F.3d at 680-81 (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). That is the case here. Accordingly, the ALJ provided specific, clear and convincing reasons to discredit Plaintiff's pain symptom allegations.

B.    *Gastrointestinal Symptoms*

Plaintiff argues that the ALJ improperly discredited her subjective gastrointestinal ("GI") symptom allegations based on a mischaracterization of Plaintiff's testimony regarding the frequency of her vomiting. The ALJ found that Plaintiff's testimony that she "vomited multiple times per day"

was unsupported by her treatment records. (Tr. 490.)

At the January 2013 hearing, Plaintiff testified that she had bouts of GI distress approximately three to four times a month, characterized by stabbing abdominal pain, vomiting, and diarrhea. (Tr. 62.) During these episodes, she spent half an hour to 45 minutes in the bathroom, multiple times a day. (Tr. 63.) At the August 2016 hearing, she testified that she still had GI problems and had suffered an episode of vomiting and diarrhea the night before the hearing due to nervousness. (Tr. 521.) Thus, the Court agrees that the ALJ mischaracterized Plaintiff's testimony. While Plaintiff testified that vomiting is one of the symptoms she suffers during GI episodes, she never claimed to vomit multiple times a day, every day. Accordingly, this was not a specific, clear and convincing reason to discredit her GI symptom allegations.

The ALJ also discredited Plaintiff's GI symptom allegations because, while Plaintiff reported no GI or abdominal issues to her primary care provider, Qilin Lu, M.D., she contemporaneously sought treatment from specialists for alternating constipation and diarrhea. The ALJ found that there was "no explanation for her vastly conflicting allegations to two different providers at the same time." (Tr. 490.) Plaintiff argues this was error, and the court agrees.

The ALJ correctly noted that treatment records spanning from January 2015 through March 2016 indicate Plaintiff reported no abdominal pain or other GI symptoms to Dr. Lu. (Tr. 779, 782, 785, 788-89, 792, 796, 800, 803-04.) However, the ALJ failed to note that Dr. Lu referred Plaintiff to the gastroenterology specialists, which clearly indicates an undocumented discussion of Plaintiff's GI complaints. (Tr. 792.) Further, the ALJ declined to make any finding that Plaintiff was malingering, and there is no indication from the record that any providers suspected malingering. On the contrary, Plaintiff's gastroenterologist ordered extensive testing which revealed poor

gallbladder functioning and ultimately resulted in surgical removal of her gallbladder. (Tr. 923, 925, 927-28, 932.) Thus, the purported conflict was not a specific, clear and convincing reason to discredit Plaintiff's GI symptom complaints.

Plaintiff argues the ALJ improperly discredited Plaintiff's GI symptom allegations based on a lack of objective medical evidence. The ALJ noted that findings from Plaintiff's April 2015 colonoscopy were "generally unremarkable." (Tr. 490.) The April 2015 colonoscopy revealed "scarring suggestive of healed colitis," small hemorrhoids, and a hyperplastic polyp while an esophagogastroduodenoscopy revealed normal findings (tr. 923, 925, 927), but, hepatobiliary imaging with fatty meal stimulation revealed a gallbladder injection fraction of only 27 percent and, as noted, prompted the surgical removal of Plaintiff's gallbladder. (Tr. 914, 928.) Thus, contrary to the ALJ's contention, the objective medical evidence revealed abnormal findings. But even if the court were to accept the ALJ's interpretation of the evidence as rational, an ALJ may not reject a Plaintiff's subjective symptom claims "solely because [they are] not substantiated affirmatively by objective medical evidence." *Robbins v. Social Sec. Admin*, 466 F.3d 880, 883 (9th Cir. 2006). Here, the ALJ failed to offer another specific, clear and convincing reason to discredit Plaintiff's GI symptom testimony. Thus, the ALJ erred.

### C.    Mental Impairment Symptoms

Plaintiff argues the ALJ erred by discrediting her mental impairment allegations based on a failure to seek treatment Plaintiff could not afford. The ALJ purported to discredit Plaintiff's mental impairment allegations because she sought "minimal mental health treatment." (Tr. 492.)

An ALJ may impugn credibility "based on an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Molina v. Astrue*, 674 F.3d 1104,

1112 (9th Cir. 2012) (quoting *Tommasetti*, 533 F.3d at 1039). However, disability benefits may not

be denied based on a claimant's failure to obtain treatment she cannot afford. *Gamble v. Chater*, 68

F.3d 319, 321 (9th Cir. 1995). Moreover, courts are reluctant to "chastise one with a mental

impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Colvin*, 100 F.3d

1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen*, 874 F.2d 116, 1124 (6th Cir. 1989)); *see*

*Garrison v. Colvin*, 759 F.3d 995, 1018, n.24 (9th Cir. 2014).

At the first hearing, Plaintiff testified that she did not have health insurance and went to the

ER for treatment. (Tr. 615, 629.) Plaintiff also testified that she went to a "free clinic," but that the

clinic was limited in the type of treatment it could provide, noting that any prescription medications

had to be on the "$4 Walmart list" because that was all Plaintiff could afford.[1] (Tr. 635.)

By November 2014, Plaintiff had health insurance and sought mental health treatment in

form of psychiatric care and cognitive processing therapy sessions through August 2015.[2] (Tr. 1049,

1072, 1076, 1079, 1078, 1081, 1085, 1087.) At the May 2016 and August 2016 hearings, Plaintiff

testified that she stopped going to counseling after her therapist left the clinic because she did not

want to retell her traumatic history to yet another person. (Tr. 516, 542.) Plaintiff also testified that

her mental health counseling did not help her, remarking that "I was getting passed to this person,

that person and nobody was helping." (Tr. 515.) Plaintiff added that she thought she could have

"gone somewhere" with her first therapist because they had a good rapport. (Tr. 515, 542.)

---

[1] The Commissioner argues that even though Plaintiff had no insurance, her access to the "free
clinic" does not excuse her failure to seek mental health treatment. There is no evidence in the
record that the "free clinic" provided mental health services. Moreover, the ALJ did not rely on
that rationale in making his finding, and the court cannot affirm on ground the ALJ did not
invoke. *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

[2] It appears, however, that Plaintiff still faced financial barriers to following through with
recommended care. *See* Tr. 1076 (Plaintiff was unable to afford prescription costing $94.00).

Thus, the record clearly indicates Plaintiff could not afford mental health treatment for a substantial period of time, but sought treatment once she had insurance. Plaintiff subsequently felt the treatment was unhelpful, and corresponding counseling and psychiatric treatment records do not contradict Plaintiff's assertion. (Tr. 1046-92.) Thus, to the extent the ALJ discredited Plaintiff's mental impairment allegations based on her failure to seek treatment, he erred. Further, the court declines to find Plaintiff's decision to cease unhelpful mental health treatment a specific, clear and convincing reason to discredit her mental impairment testimony.

Plaintiff also argues that the ALJ erred by discrediting her mental impairment testimony for discussing her mental health issues primarily with mental health providers. The ALJ found that the extent of Plaintiff's mental impairments were unsupported by the record because Plaintiff's "primary care records show little indication of psychological problems," while she endorsed "significant mental health impairments during evaluations conducted for the purpose of establishing benefits and throughout brief counseling notes." (Tr. 491.) The ALJ did not make an affirmative finding of malingering, however.

Plaintiff's counseling and psychiatric appointments overlapped with her treatment with Dr. Lu, where she frequently reported insomnia (tr. 782, 785, 800, 803-04) and occasionally reported depression. (Tr. 779, 800.) Notably, Dr. Lu prescribed amitriptyline and trazodone.[3] (Tr. 777, 781, 790, 802.) In March 2016, Plaintiff reported anxiety; consequently, Dr. Lu diagnosed a generalized anxiety disorder and prescribed Lexapro. (Tr. 779-80.) That same month, Plaintiff also underwent an evaluation by Juan Ruiz Hurtarte, M.D., at Waters Edge Memorial Pain Relief Institution. (Tr.

---

[3] Amitriptyline is used to treat symptoms of depression and some pain symptoms and Trazodone is primarily used to treat depression, but may be used to treat anxiety and insomnia. MedlinePlus, https://medlineplus.gov (last visited Mar. 20, 2018). *See* Tr. 1049 (discussion of Plaintiff's medications).

780, 934-38.) The one-hour exam consisted of an interview, a review of medical history and treatment, and a physical exam. (*Id.*) Dr. Hurtarte assessed Plaintiff with myofascial muscle pain, depression with anxiety, and chronic low back pain; he recommended physical therapy, therapy with a pain psychologist, and cognitive behavioral therapy. (Tr. 934.)

Although treatment notes from Plaintiff's counseling and psychiatric appointments provide greater detail of her mental impairment allegations, they are not incongruous with her reports of insomnia, depression, and anxiety to Dr. Lu. Moreover, counseling and treatment notes include affect and mood observations by providers that are consistent with Plaintiff's mental impairment allegations. (Tr. 1062, 1072, 1078, 1088, 1087, 1085.) Therefore, it is not evident that Plaintiff presented conflicting mental impairment claims to different providers and, accordingly, the ALJ's rationale was not a specific, clear and convincing reason to discredit her subjective mental impairment allegations.

Plaintiff further argues the ALJ improperly discredited her mental impairment allegations based on the 2011 opinion of examining consultative psychologist, Jay Toews, Ed.D., who indicated Plaintiff demonstrated "poor effort" during memory testing. The ALJ relied heavily on Dr. Toews' report to discredit Plaintiff's mental impairment allegations, highlighting her successful performance in portions of the exam, and noting that Plaintiff's "mood and affect were not consistent with her cognitive or affect complaints." (Tr. 400, 491.)

Plaintiff's performance during Dr. Toews' exam is particularly relevant to her allegations of memory impairment. At the January 2013 hearing, Plaintiff testified that she was unable to "keep in my head what I'm supposed to do," and admitted that she had flooded her kitchen twice after forgetting she had water running to thaw frozen food. (Tr. 46, 53.) She also testified that she was

unable to watch half-hour television programs without pausing to take a break due to her inability

to concentrate. (Tr. 52.) At the August 2016 hearing, Plaintiff testified that she tried to read, but "I

don't understand what I've read. I go back and read the same chapters over and over, and it's very

frustrating because I love to read." (Tr. 520.)

Following the 2011 exam, Dr. Toews concluded that Plaintiff's verbal memory fell in the

"borderline range" and was slightly inferior to her visual memory, while her "working memory" was

in the low-average range. (Tr. 400.) Dr. Toews opined that Plaintiff's "interest and motivation

seemed fair," while her "attention and concentration were variable during testing," resulting in a

possible underestimation of two levels of memory functioning. (*Id.*) Plaintiff's "Single Trial

Learning" and "Retention" scores fell in the "extremely low" range, while her "Learning Slope"

score fell in the high-average range. (Tr. 401.) Dr. Toews opined that Plaintiff "may not have put

forth a good effort when presented with verbal learning tasks," and he felt the lower scores were

attributable to "functional and volitional issues," rather than memory problems. (*Id.*)

Subsequent records contain minimal reference to Plaintiff's alleged memory impairment.

The ALJ, therefore, could reasonably conclude that Dr. Toews' report conflicted with Plaintiff's

allegations.

The ALJ also relied on Dr. Toews' observations of Plaintiff's affect and mood to discredit

her depression and anxiety allegations. Significantly, however, treatment records from Plaintiff's

counseling and psychiatric appointments indicate Plaintiff frequently exhibited a mood and affect

consistent with her anxiety and depression complaints, making Dr. Toews' observation an outlier

in that regard. (Tr. 1048, 1074, 1062, 1067, 1072, 1078, 1081, 1085, 1087-88.) The ALJ failed to

reconcile these conflicting observations or explain why Dr. Toews' single encounter provided a

sufficient reason to discredit Plaintiff's mental impairment allegations. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001) (a treating physician's most recent medical reports are highly probative). Accordingly, the ALJ's rationale for discrediting Plaintiff's mental impairment allegations based on Dr. Toews' mood and affect observations was not specific, clear and convincing.

In sum, the ALJ properly discredited Plaintiff's poor memory allegations but erred in discrediting her remaining mental impairment allegations.

II.     Medical Opinion Evidence

    *A.      Qilin Lu, M.D.*

Medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion is owed controlling weight. To reject the uncontradicted opinion of a treating physician, the ALJ must provide clear and convincing reasons; to reject a treating physician's contradicted opinion, the ALJ must provide specific and legitimate reasons supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). An ALJ can satisfy the substantial evidence requirement by setting out a detailed summary of the facts and conflicting evidence, stating his interpretation, and making findings. *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600–01 (9th Cir. 1999). However, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted). Notably, "even when contradicted, a treating or

examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F. 3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

Plaintiff argues that the ALJ erred by failing to apply the appropriate factors to determine what weight to assign Dr. Lu's opinion and gave legally insufficient reasons for giving "little weight" to portions or Dr. Lu's opinion.

The record reflects that Plaintiff was examined by Dr. Lu six times between January 2015, when she first established care with Dr. Lu as her primary care provider, and October 2015, when Dr. Lu completed a three-page medical opinion questionnaire. (Tr. 774-76, 785, 789, 792, 796, 800, 803.)

On a medical opinion questionnaire, Dr. Lu stated that Plaintiff had been diagnosed with COPD, fibromyalgia, insomnia, and menopause. (Tr. 774.) Dr. Lu described Plaintiff's symptoms as "shortness of breath, muscle pain/myalgia" and indicated that clinical findings had been relatively normal except for "reduced lung air entry due to COPD." (*Id.*) Dr. Lu indicated Plaintiff would need to lie down during the day, but failed to explain why and for how long. (*Id.*) Dr. Lu stated that fibromyalgia was reasonably likely to cause Plaintiff pain, but that work on a continuous basis was not likely to cause Plaintiff's condition to deteriorate; Dr. Lu added that physical activity was encouraged for treatment purposes, but that Plaintiff may not be able to participate in full-time work.[4] (Tr. 774-75.) When asked to select the exertional level of work Plaintiff could perform, Dr. Lu partially circled "light work." (Tr. 775.) Additionally, Dr. Lu wrote, "[n]ot sure but as much as tolerated," below the list of exertional levels. (*Id.*)

---

[4] There appears to a scrivener's error in this note. Given the context, the court has presumed Dr. Lu meant Plaintiff may not be able to participate in full-time work.

The ALJ gave "great weight" to the portion of Dr. Lu's opinion finding Plaintiff could perform light work, noting that the opinion was "generally consistent with the imaging results and physical evaluations throughout the records." (Tr. 492.) The ALJ gave "little weight" to Dr. Lu's opinion that Plaintiff needed to lie down during the day because Dr. Lu did not provide an explanation for the assessment, and the medical records indicated Plaintiff was able to ambulate well without apparent distress. (*Id.*)

Although, the ability to ambulate well[5] does not necessarily conflict with the need to lie down during the day, the ALJ properly rejected Dr. Lu's opinion based on a lack of support. *Bayliss*, 427 F.3d at 1217 (9th Cir. 2005) (an ALJ is not required to accept the opinion of any physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings). Here, Dr. Lu failed to provide any support for his opinion. Indeed, Dr. Lu noted that Plaintiff's clinical findings had been relatively normal. (Tr. 774.) Moreover, upon a careful review of the treatment record, the court found no objective evidence supporting the contention that Plaintiff needs to lie down during the day. Accordingly, the ALJ did not err in giving little weight to that portion of the opinion.

Plaintiff points out that the ALJ failed to address Dr. Lu's annotation, "[n]ot sure but as much as tolerated," and argues this was error because the annotation suggests Dr. Lu was unsure if Plaintiff could perform light work. However, insofar as the annotation created ambiguity, the ALJ is responsible for resolving ambiguities and conflicts in the medical testimony. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Here, the ALJ resolved the ambiguity by finding Dr. Lu's statement indicated Plaintiff could perform light work.

---

[5] The record shows that during two of six visits, Dr. Lu observed Plaintiff had impaired ambulation. (Tr. 789, 800.)

*B.     Robert Hoskins, M.D.*

Plaintiff argues the ALJ erred by improperly crediting the 2011 opinion of state agency non-examining physician, Robert Hoskins, M.D., who opined that Plaintiff was capable of performing light work. The ALJ gave "great weight" to Dr. Hoskins's findings, remarking that his 2011 opinion "is consistent with the longitudinal history of the treatment notes," and that "subsequent records do not show any significant deterioration" of Plaintiff's condition. (Tr. 492.)

Significantly, Dr. Hoskins's opinion that Plaintiff was capable of performing light work is consistent with that of Dr. Lu. As noted above, the ALJ did not err in his interpretation of Dr. Lu's opinion, and therefore, any error in according great weight to Dr. Hoskins's 2011 opinion was harmless insofar as the opinions were consistent.

*C.     Jay Toews, Ed.D.*

Plaintiff argues the ALJ erred by giving "great weight" to Dr. Toews' opinion, alleging Dr. Toews did not personally administer the consultative examination, and should not be credited as an "acceptable medical source."

The court first notes a procedural issue regarding this asserted error, whether the court may review this objection on appeal. Plaintiff's attorney apparently has lodged various complaints to the state agency regarding Dr. Toews since 2001, and the state agency nonetheless has continued to use Dr. Toews as a consultant. (Tr. 287-318.) The authority to monitor the consultative exam process and the medical consultants approved to be examiners is designated to the state agencies that make disability determinations for the Social Security Administration. 20 C.F.R. § 416.919s. This code-granted authority requires that state agencies adopt "procedures for handling complaints" and procedures for annual onsite reviews of providers. 20 C.F.R. § 416.919s(f)(9),(11).

Plaintiff does not appear to have raised this issue in her first request for district court review. (Tr. 585-99.) Additionally, the Code of Federal Regulations provides that a claimant or her representative may object for "good reason" to a medical source designated to perform a consultative exam *before* the exam is conducted. 20 C.F.R. § 416.919j. Here, Plaintiff lodged no objection to Dr. Toews conducting the consultative exam prior to the exam itself; rather, Plaintiff objected in January 2012, several months after the exam and only after Dr. Toews issued his opinion. (Tr. 269-70, 287-89.) Thus, assuming without deciding that the court has authority to review an objection to a medical consultant, it appears Plaintiff untimely asserted the objection. Thus, the court cannot review Plaintiff's objection at least this reason.

Further, at the January 2013 hearing, Plaintiff's attorney requested another consultative psychological exam, but did not object to Dr. Toews's report as an exhibit. (Tr. 91.) Nonetheless, in the ALJ's first opinion, he noted Plaintiff's objection to Dr. Toews's exam, but determined that "the examiner is qualified to offer his medical opinion in this claim." (Tr. 559.) Only after the ALJ rendered an unfavorable decision did Plaintiff submit to the Appeals Council an objection to Dr. Toews's report. (Tr. 38, 285-86.) Again assuming without deciding that the court has authority to review an objection to a medical consultant, the court finds Plaintiff's objections either are waived or untimely and are, accordingly, overruled.

Plaintiff next argues that Dr. Toews's report contains unresolved internal inconsistencies – specifically, that Plaintiff "related and interacted well" (tr. 399) and that her "motivation and interest seemed fair" during testing (tr. 400) conflict with the observation that her "[m]otivation and effort during memory testing appeared to be less than optimal." (Tr. 401.) The court disagrees. The observation that Plaintiff "related and interacted well" was relevant to her social interaction abilities,

rather than her testing efforts. While Dr. Toews noted that Plaintiff's "motivation and interest seemed fair," he also noted that her "attention and concentration were variable." (Tr. 400.) The observation that Plaintiff's "motivation and effort during memory testing was less than optimal" does not conflict with the earlier observations; rather, it clarifies where her efforts appeared to vary. (Tr. 401.) Accordingly, these were not internal conflicts, and the ALJ did not err by failing to address them.

D.      *Alex Fisher, Ph.D.*

Plaintiff argues the ALJ erred by improperly giving great weight to the 2011 opinion non-examining agency consulting psychologist, Alex Fisher, Ph.D., which did not take into account Plaintiff's subsequent mental health records. The court agrees.

The ALJ gave great weight to Dr. Fisher's opinion that Plaintiff has "no limitations in activities of daily living, mild limitations in social functioning, and moderate limitations in concentration, persistence, and pace." (Tr. 493.) In reaching his conclusion, Dr. Fisher credited Dr. Toews's report, noting that Plaintiff had appeared "overly dramatic" and that her affect had been inconsistent with her complaints. (Tr. 110.) Dr. Fisher also noted that Plaintiff's medical records lacked sufficient documentation of her psychological complaints. (Tr. 110-11.) By 2016, however, Plaintiff had undergone several months of counseling sessions, a psychiatric evaluation, and a pain evaluation with psychological findings. Notably, no other provider found Plaintiff to be "overly dramatic" or noted an affect inconsistent with her alleged symptoms. Regardless, the ALJ failed to discuss why, in light of the recent additional mental health records, Dr. Fisher's opinion was still relevant or due great weight. This was error. *See Osenbrock,* 240 F.3d at 1165.

\ \ \ \ \

PAGE 21 - OPINION AND ORDER

III.    Lay Witness Evidence

Plaintiff alleges the ALJ improperly rejected Ms. Boyce's lay witness testimony. The ALJ gave "some weight" to Ms. Boyce's testimony, noting that Ms. Boyce testified that she does not see Plaintiff very often. (Tr. 494.) The ALJ credited Ms. Boyce's observation that Plaintiff's overall health had deteriorated, but discredited her testimony regarding Plaintiff's physical impairments because they were "not documented by the longitudinal history of the treatment records . . . showing generally unremarkable imaging results and mild findings on physical evaluations." (*Id.*) Additionally, the ALJ discredited Ms. Boyce's testimony regarding Plaintiff's memory impairment because it was inconsistent with Dr. Toews's evaluation. (*Id.*)

At the first hearing, Ms. Boyce testified that she saw Plaintiff a couple of times a week and that Plaintiff was usually in her room, either watching television or sleeping. (Tr. 641.) Ms. Boyce described Plaintiff as moody, tearful, and introspective most of the time and testified that Plaintiff would not leave her room without prompting. (Tr. 641-42.) Ms. Boyce added that that when she was able to persuade Plaintiff to leave her room and do things around the house, Ms. Boyce had to continuously remind her of the task at hand due to Plaintiff's distractibility. (Tr. 642-44.) For example, Ms. Boyce related that if she asked Plaintiff to get laundry from her room, Ms. Boyce would find Plaintiff sitting and watching television instead, having forgotten that she was supposed to get her laundry. (Tr. 643.) Ms. Boyce testified that Plaintiff was unable to leave her house, which prevented Plaintiff from going to visit her granddaughter unless her granddaughter. (Tr. 645.)

At the second hearing, Ms. Boyce testified that she did not see her mother "very often," although her mother sometimes stayed with her. (Tr. 526-27.) During such visits, Ms. Boyce observed that Plaintiff had a "hard time finding her words." (Tr. 527.) Ms. Boyce witnessed

Plaintiff struggle to remember simple tasks, like opening her purse to retrieve eyeglass cleaner but forgetting why she opened her purse. (*Id.*) Ms. Boyce testified that if Plaintiff attempted to help Ms. Boyce prepare a meal, Plaintiff would need to sit down and relax for about ten minutes before being able to help for another five- or ten-minute period. (Tr. 528.) Ms. Boyce also testified that Plaintiff was usually exhausted and in pain by 11:30 a.m. or noon and needed to lie down on her bed and nap for hours with her heating pad. (Tr. 528-29.)

The ALJ must provide "germane reasons" for rejecting lay witness testimony. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). While an ALJ may reject lay witness testimony that conflicts with medical evidence, he may not reject it solely based on lack of support. *See Lewis*, 236 F.3d at 511 (noting an ALJ may discount lay testimony that "conflicts with medical evidence") (citing *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984)). Here, the ALJ discredited Ms. Boyce's testimony based on a lack of support in the medical records as opposed to any conflict between her testimony and the medical evidence. In fact, the record supports Ms. Boyce's testimony that Plaintiff spends substantial amounts of time in bed with a heating pad, as physicians have noted low back skin discoloration and damage from prolonged heating pad use. (Tr. 430, 460, 1081-82.)

In his first written opinion, the ALJ discredited Ms. Boyce's testimony altogether, finding that it was likely based on Plaintiff's self-reporting. (Tr. 560.) The District Court for the Eastern District of Washington found this to be harmful error, noting that Ms. Boyce testified as to her own observations, and ordered the ALJ to reevaluate Ms. Boyce's testimony on remand. (Tr. 596.) On remand, the ALJ ignored Ms. Boyce's prior testimony and discredited her testimony from the August 2016 hearing, in part, because Ms. Boyce did not see her mother "that often." Notably, however, Ms. Boyce's testimony in the second hearing was consistent with her testimony in the first – which was

based on her twice-weekly observations of her mother. Moreover, Ms. Boyce's second hearing testimony that her mother had to lie down for hours to nap indicates that when she did see her mother, it was for substantial periods of time. Thus, to the extent the ALJ discredited Ms. Boyce's testimony based on this mischaracterization of her opportunity to observe, it was error. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) ("Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence.").

Each time she testified, Ms. Boyce recounted different and specific incidents where she observed Plaintiff forget what she was supposed to be doing. (Tr. 527, 642-44.) The ALJ discredited these accounts, finding them inconsistent with the findings from Dr. Toews' evaluation. (Tr. 494.) However, Dr. Toews' report noted that Plaintiff's test scores varied widely, and that Plaintiff's retention score fell in the extremely low range. (Tr. 401.) Thus, there is not a clear conflict between Dr. Toews's evaluation and Ms. Boyce's testimony. *See Bruce v. Astrue*, 557 F.3d 1113 (9th Cir. 2009).

In sum, the ALJ did not provide a specific, germane reason to discredit Ms. Boyce's testimony.

IV.    Step Two Determination

Plaintiff argues the ALJ erred by failing to recognize fibromyalgia as a medically determinable impairment at step two and by failing to incorporate accompanying limitations into the RFC. The Commissioner argues that the ALJ's determination complied with Social Security Ruling (SSR) 12-2p but, even if the ALJ erred, the error was harmless because no additional limitations would have been added to the RFC.

PAGE 24 - OPINION AND ORDER

A medically determinable impairment of fibromyalgia may be established by meeting one of two sets of criteria, based on evidence from a licensed physician. SSR 12-2p at *2-*3. The first set of criteria requires: 1) a history of widespread pain; 2) at least 11 positive bilateral tender points on physical exam; and 3) evidence that other disorders that could have caused the symptoms were ruled out. *Id.* at *3. The second set of criteria requires: 1) a history of widespread pain; 2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and 3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. *Id.*

After a thorough review of the record, the Court agrees that the available medical evidence does not meet either set of criteria. Significantly, in January 2011, Jeffrey Merrill, M.D., conducted a physical exam and concluded that Plaintiff did not appear to have classic fibromyalgia tender points. (Tr. 367-68.) Moreover, other causes of Plaintiff's symptoms have not been ruled out. For example, it is unclear whether Plaintiff's GI problems could have been caused by opiate use (tr. 923), colitis (tr. 356-62, 923), or her poorly functioning gallbladder (tr. 914, 928, 932).

Regardless, the ALJ noted that Plaintiff's "complaints with regard to this impairment are primarily fatigue and body pain" and that even if fibromyalgia was a medically determinable impairment, it "would not cause any additional limitations than those that have already been accommodated for" in the RFC. (Tr. 485.) Accordingly, because the ALJ considered fibromyalgia at subsequent steps, any error in failing to include fibromyalgia as a medically determinable impairment at step two was harmless. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

\ \ \ \ \

V.    Failure to Appoint a Medical Expert

Plaintiff argues that the ALJ erred by failing to appoint a medical expert to review Plaintiff's GI complaints and opine as to associated functional limitations. The Commissioner argues the ALJ properly considered the request for a consultative exam and concluded none was needed.

In its remand order, the District Court for the Eastern District of Washington recommended that the ALJ appoint a medical expert to interpret Plaintiff's medical records concerning irritable bowel syndrome ("IBS"). (Tr. 598.)  The Court suggested that the medical expert could also consider whether Plaintiff's IBS symptoms could effectively be controlled with medication, changes in diet or lifestyle, or management of mental impairments. (*Id.*)  At the August 2016 hearing, Plaintiff's attorney requested that the ALJ send Plaintiff for a consultative physical examination, arguing that it would be consistent with the Court's order. (Tr. 512, 534-35.)  The ALJ declined the request, noting that the record contained "significant physical examinations" spanning a period of several years and that "no argument has been made to support a finding that a consultative evaluation would be of any benefit in this case, or that it would provide any information that is not readily available in the records." (Tr. 482.)  The ALJ further noted that Plaintiff's "gastrointestinal issues do not appear to have any clear diagnosis, " and concluded that a one-time consultative exam would not contribute greater clarity to the issue, despite the clear record of extensive testing for GI symptoms. (Tr. 482-83.)

The ALJ is tasked with "fully and fairly" developing the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" *Id.* (quoting *Smolen*, 80 F.3d at 1288).  Here, the ALJ noted ambiguities in

the record regarding Plaintiff's GI issues – a lack of clear diagnosis, and an absence of complaints to Dr. Lu regarding GI distress symptoms while simultaneously seeking treatment from gastroenterology specialists. Such ambiguities trigger the ALJ's duty to supplement the record which may be accomplished by ordering a consultative exam, or by re-contacting the claimant's physician for clarification. 20 C.F.R. §§ 416.912(b), 416.919a-b. Here, the ALJ did neither, and instead used the ambiguity as a basis to deny Plaintiff benefits. This was error.

### Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harmen v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138–39 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award

of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (*en banc*)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

Here, the ALJ erred by: (1) improperly discrediting Plaintiff's subjective GI and mental health symptom testimony; (2) improperly discrediting lay witness testimony; (3) improperly crediting Dr. Fisher's opinion; and (4) failing to resolve conflicts and ambiguities in the medical record, especially as they pertain to the limitations that could reasonably be expected to be caused by Plaintiff's GI and mental health impairments. Because the record as it currently stands is not free of ambiguity, it is not complete for the purposes of the credit-as-true rule. Accordingly, the proper course is to remand for further proceedings. Given the passage of time and accumulation of new evidence since agency consulting examiners last issued opinions regarding Plaintiff's physical and mental impairments, the ALJ on remand must, at a minimum, obtain additional medical and psychological consultative examinations to properly evaluate the extent and severity of Plaintiff's GI and mental impairment symptoms.

*Conclusion*

Based on the foregoing, the Commissioner's decision denying Plaintiff's application for SSI is REVERSED and REMANDED for further proceedings consistent with this opinion.

Dated this _____10th_____ day of April, 2018.

JOHN V. ACOSTA
United States Magistrate Judge